UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

VSI HOLDINGS, INC., et al.,

      Plaintiffs/Counter-Defendants,

                                        Case No. 03-CV-70225-DT

v.

                                        HONORABLE DENISE PAGE HOOD

SPX CORPORATION,

      Defendant/Counter-Plaintiff.

_____/

MEMORANDUM OPINION AND ORDER
and
NOTICE OF STATUS CONFERENCE

## I.  BACKGROUND/FACTS

VSI Holdings, Incorporated ("VSI"), is a former public company once listed on the American Stock Exchange.  VSI was in the business of selling, marketing and related services, and other business fulfillment services.  (Second Am. Comp., ¶ 1) VSI's corporate headquarters were located in Bloomfield Hills, Michigan.  (*Id.)*  VSI was founded by Steve Toth, Jr., who also was the company's Chief Executive Officer and the majority stock owner, controlling about 83% of VSI's equity shares.  (*Id.,* ¶¶ 1-4)

VSI and SPX Corporation ("SPX") entered into an Agreement and Plan of Merger ("Agreement") dated March 24, 2001.  SPX is a public company with its headquarters in Charlotte, North Carolina.  (Ans. to Second Am. Comp., ¶ 1) SPX manufactures and sells a variety of technical, industrial, and flow technology products, such as automated fare-collection machines used in public transportation, cooling towers, automotive testing equipment, industrial fire protection systems, etc. (*Id.*)  SPX agreed to purchase the stock of VSI.  The purchase price was a combination

of cash and stock in SPX in the amount of $197 million.  (Agreement, §§ 1.3, 4.1(a)(ii)(K), (L))
SPX was to purchase all of VSI's outstanding equity shares and assume of approximately $50
million in existing debt.  The price SPX would pay was fixed at a premium price of $4.35 per VSI
share.  (Agreement, § 1.3)  The Agreement provided that the transaction would close by June 30,
2001, with the possibility of extending the closing date even further.  (Agreement, § 7.1(b)(i))

At a meeting on May 8, 2001, SPX delivered a notice to VSI that SPX intended to terminate
the Merger Agreement.  (5/8/01 Letter to Toth) The letter from Stephen A. Tsoris, counsel for SPX,
to Steve Toth, Jr., Chairman of Plaintiff, states that pursuant to Section 7.1(c) of the Agreement, VSI
had materially breached its representation in Section 2.9 of the Agreement.  Mr. Tsoris writes that
there has been a significant deterioration in the revenues, profits and prospects of VSI Holdings,
including cancellation of several customer contracts, such as a purchase order from General Motors
Corporation for approximately $6,000,000.  (*Id.*)  Mr. Tsoris states that VSI Holdings failed to
disclose these facts and effects in the Company Disclosure Schedule.  Mr. Tsoris further states that
VSI Holdings has breached the covenant set forth in Section 4.1(a)(ii)(L) of the Agreement by
allowing Working Capital to decline while Revolving Debt increased.  Mr. Tsoris indicates that
these breaches each constitute a Company Material Adverse Effect and if not cured, permits SPX
to terminate the Agreement.  Mr. Tsoris concludes that SPX believes that the deterioration of VSI's
business is so significant that it cannot be cured.  (*Id.*)

On the same day, May 8, 2001, after trading on the stock market closed for the day, SPX
issued a press release on its notice to terminate the Agreement, without written consent by VSI.  The
following day, May 9, 2001, the first stock trading day after SPX's issuance of its press release,
114,900 shares of VSI stock were traded, compared to 13,100 and 10,000 shares traded in the

previous two business days.  VSI's stock price fell $1.98 per share to $2.75 per share on that day and never recovered.

In September 2001, VSI and its shareholders (collectively, "VSI") filed the instant lawsuit against SPX with the Circuit Court for the County of Oakland, State of Michigan.  On July 31, 2002, VSI filed a Second Amended Complaint alleging breach of contract by SPX.  (Second Am. Comp.)  On August 30, 2002, SPX filed its Answer to the Second Amended Complaint, along with its Counterclaims alleging breach of contract, fraud and conspiracy.  (Answer and Counterclaim)

VSI filed a voluntary petition for bankruptcy on November 8, 2002, over a year after SPX terminated the merger.  On August 26, 2003, VSI's plan of liquidation was approved by the Bankruptcy Court for the Eastern District of Michigan.  (Order Confirming Debtors' Am. Plan of Liquidation) On January 17, 2003, VSI filed a Motion for Withdrawal of Reference from the United States Bankruptcy Court to the United States District Court under 28 U.S.C. § 157(d).  The Honorable John Corbett O'Meara granted the motion.  The matter was reassigned to the undersigned on August 19, 2003.

This matter is before the Court on four dispositive motions filed by the parties: 1) Defendant SPX's Motion for Summary Judgment on VSI's Liability for Breach of Contract; 2) Defendant SPX's Alternative Motion for Partial Summary Judgment Against Plaintiffs' Damages Claims; 3) Plaintiff VSI's Motion for Summary Judgment that Defendant SPX Corporation is Liable; and 4) Plaintiff VSI's Motion for Summary Judgment on Counts II and III of SPX Corporation's Counterclaim.[1]  Responses, replies and supplemental briefs have been filed.  A hearing was held on

---

[1] The Court notes that both parties in their various briefs set forth "Statement of Undisputed Facts," which, of course, the other party then claims are full of misrepresentations of the record. Given the numerous exhibits submitted by the parties to date in this case, the parties have not agreed

the matter.

## II.    ANALYSIS

### A.    Summary Judgment Standard

Rule 56(c) of the Rules of Civil Procedure provides that summary judgment be entered only where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).   A dispute about a material fact is "genuine" only if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. Although the court must view the motion in the light most favorable to the nonmoving party, where "the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24, 106 S.Ct. 2548, 91 L.Ed. 265 (1986).   Summary judgment must be entered against a party who fails to make a showing sufficient to establish the existence of an essential element of that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. *Celotex Corp.*, 477 U.S. at 322-23.   A court must look to the substantive law to identify which facts are material.   *Anderson*, 477 U.S. at 248.

---

to any "Undisputed Facts."

**B.      SPX's Motion for Summary Judgment on VSI's Liability for Breach of Contract**

**1.      Interpretation of Contract Language**

In Michigan, the paramount goal when interpreting a contract is to give effect to the intent of the contracting parties. *Old Kent Bank v. Sobczak*, 243 Mich. App. 57, 63-64 (2000). The court is to read the agreement as a whole and attempt to apply the plain language of the contract itself. *Id*. If the intent is clear from the language of the contract itself, there is no place for further construction or interpretation of the agreement. *Farm Bureau Mut. Ins. Co. v. Nikkel*, 460 Mich. 558, 566 (1999). A contract provision that is clear and unambiguous must be "taken and understood in [its] plain, ordinary, and popular sense." *Mich. Mut. Ins. Co. v. Dowell*, 204 Mich. App. 81 (1994). Unambiguous contract provisions are not subject to interpretation and must be enforced as written. *Id.*

A contract may be considered ambiguous when terms are factually inconsistent or the phraseology can suggest different meanings or obligations to be undertaken. *Port Huron Educ. Ass'n MEA/NEA v. Port Huron Area Sch. Dist.*, 452 Mich. 309, 323 (1996). Contract provisions are considered ambiguous when the "terms are reasonably and fairly susceptible to multiple understandings and meanings." *Equitable Life Assurance Soc'y v. Poe*, 143 F.3d 1013, 1016 (6th Cir. 1998) (*citing Mich. Mut. Ins. Co.*, 204 Mich. App. at 81). The initial determination of whether the contract language is ambiguous is a question of law for the court to decide. *Rainbow Nails Enterprises, Inc. v. Maybelline, Inc.*, 93 F. Supp. 2d 808, 820 (E.D. Mich. 2000) (*citing Port Huron Educ. Ass'n*, 452 Mich. at 323) Once the court determines that the contract is ambiguous, it is subject to further construction or interpretation. "It is well settled that the meaning of an ambiguous contract is a question of fact that must be decided by the jury." *Klapp v. United Ins. Group Agency,*

5

*Inc.,* 468 Mich. 459, 469 (2003).  "In resolving such a question of fact, i.e., the interpretation of a contract whose language is ambiguous, the jury is to consider relevant extrinsic evidence."  *Id.* "Looking at relevant extrinsic evidence to aid in the interpretation of a contract whose language is ambiguous does not violate the parol evidence rule."  *Id.* at 470.  Parol evidence  bars language which adds to or detracts from the writing, but not evidence which merely ascertains the meaning of what the parties intended.  *Id.*  Ambiguity in a contract is resolved against the party who prepared it.  *Lichnovsky v. Ziebart Int'l Corp.*, 414 Mich. 558, 566 (1999).

### 2.      Termination Clause

SPX claims that VSI breached the Agreement by violating several Debt-Related Covenants, that the breach was material, and constituted a Company Material Adverse Affect, therefore, SPX properly terminated the Agreement on the basis of VSI's breaches.  In response, VSI argues that SPX has failed to show that the alleged breaches were material, that the breaches did not constitute a Company Material Adverse Affect, as defined under the Agreement, therefore, SPX wrongfully terminated the Agreement.

The Termination provision of the Agreement relied upon by SPX, states:

> 7.1    Termination.  This Agreement may be terminated at any time prior to the Effective Time, whether before or after approval of the stockholders of the Company:
>
> *   *   *
>
> (c)    By Purchaser if the Company shall have breached in any material respect any of its representations, warranties or covenants under this Agreement, such breach shall constitute a Company Material Adverse Effect, Purchaser shall have given written notice to the Company of such breach promptly after learning of the same, and such breach shall not be reasonably cured on or prior to the Closing Deadline.

6

(Agreement, § 7.1(c)).

SPX argues that VSI materially breached its Debt-Related covenants, satisfying the first phrase of subsection (c). SPX then argues that the second phrase of subsection (c) means that "such breach," referring to VSI's breach of the Debt-Related Covenants, constitutes a "Company Material Adverse Effect." SPX argues it gave proper notice of the breaches to VSI in its May 8, 2001 letter, and, VSI did not cure the breaches before the Closing Deadline. SPX claims it has satisfied the Termination provision, therefore, it is entitled to summary judgment in this case on the breach of contract claims. SPX essentially argues that the phrase, "such breach shall constitute a Company Material Adverse Effect," is parenthetical to the first phrase, "if the Company shall have breached in any material respect any of its representations, warranties or covenants under this Agreement," modifying the first phrase to mean that any material breach by VSI of its representations or covenants is a Company Material Adverse Effect. SPX points to subsection (d) of § 7.1 to support its argument. In subsection (d), after the first phrase, the word "and" appears before the second phrase, "such breach shall constitute a Purchaser Material Adverse Effect," whereas in subsection (c), the word "and" is omitted.

VSI argues that the Termination provision requires four elements to be met before SPX can terminate the Agreement: 1) VSI materially breaches a representation, warranty or covenant; and 2) VSI's breach constitutes a "Company Material Adverse Effect," as by the Agreement.; and 3) SPX provides prompt written notice as specified to VSI; and 4) VSI is afforded an opportunity to cure the breach and cannot do so. VSI claims SPX did not meet all four elements of the Termination provision. VSI essentially argues that subsection (c) is a list of independent elements which must be met by SPX in order to terminate the Agreement.

7

2:03-cv-70225-DPH   Doc # 224   Filed 09/30/05   Pg 8 of 22   Pg ID 5579

"Proper syntax provides that commas usually set off words, phrases, and other sentence elements that are parenthetical or independent." *Dale v. Beta-C, Inc.,* 227 Mich. App. 57 (1998). The general rule of grammatical construction is that a modifying clause is confined to the last antecedent word or phrase, unless a contrary intention appears. *Id.* After reviewing the language in subsection (c), the Court finds that the second phrase could be read either way. The second phrase could be a parenthetical phrase which modifies the phrase immediately before it, or, the commas between the phrases merely set off the four independent phrases. Although subsection (d) does have the word "and" before the second phrase, the Court's independent review of subsection (c) shows that this provision could be read both ways, as argued by the parties. This renders subsection (c) ambiguous. The Court, however, cannot construe the provision against the drafter because testimony shows that various individuals from both parties negotiated the agreement, made comments on the agreement, and participated in drafting the language in the Agreement. (Appleman Dep., pp. 32, 33, 43; Tsoris Dep., pp. 44-45) Because the meaning of subsection (c) is ambiguous, it is a question of fact that must be decided by the jury. *Klapp,* 468 Mich. at 469.

### 3.    Material Breach

SPX argues that VSI's breach of its covenants was material. VSI claims that the issue of whether a breach was "material" is a question for the jury.

In Michigan, "[w]hether a breach is material is a question of fact." *Heidtman Steel Prod., Inc. v. Compuware Corp.,* 164 F. Supp. 2d 931, 936 (N.D. Ohio 2001) (citing cases applying Michigan law, *Werner Gommeringer v. Amway Corp.*, No. G85- 832, 1988 U.S. Dist. LEXIS 17824, *6, (W.D. Mich.1988) (unpublished) and *Pratt v. Van Rensselaer,* 235 Mich. 633, 209 N.W. 807 (1926)).

Even though SPX submitted evidence that VSI "admitted" it violated the Revolving Debt/Working Capital Covenant of the Merger Agreement, the issue of whether any alleged breach is "material" is an issue for the trier of fact.

### 4.    Company Material Adverse Affect

SPX argues that VSI's breach of the three debt-related covenants constitutes a *per se* Company Material Adverse Affect under § 7.1(c) of the Termination clause.  If the Termination provision is seen as a list of independent elements to be met (as argued by VSI), VSI claims that SPX cannot show a "Company Material Adverse Affect" as defined in the Agreement because the term excepts a Company Material Adverse Effect from general business or economic conditions and conditions generally affecting the industry in which VSI competes.  The term "Company Material Adverse Effect" is found in Article 2 of the Agreement, "Representations and Warranties of the Company," which states,

> 2.1    Due Incorporation and Good Standing. ...  For the purposes of this Agreement, any reference to a state of facts, event, change or effect having a "Company Material Adverse Effect" means such state of facts, event, change or effect that (a) has had, or reasonably likely to have, a material adverse effect on the business, results of operation, prospects or financial condition of the Company and the Company Subsidiaries taken as a whole ...; provided that the following state of facts, events, changes and the effects thereof shall be disregarded and shall in no event constitute a Company Material Adverse Effect: (i) general business or economic conditions, (ii) conditions generally affecting the industry in which the Company and the Company Subsidiaries compete, (iii) the taking of any action contemplated by this Agreement, and (iv) the announcement or pendency of the transactions contemplated in this Agreement.

(Agreement, § 2.1) The phrase initially defining "Company Material Adverse Effect" is followed by a semicolon which then sets forth the conditions which do not constitute a Company Material Adverse Effect.  A "'[s]emicolon' is defined as 'the punctuation mark (;) used to indicate a major

9

division in a sentence where a more distinct separation is felt between clauses or items on a list than

is indicated by a comma, as between the two clauses of a compound sentence.'" *People v. Beardsley,*

263 Mich. App. 408, 413 (2004) (*citing Random House Webster's College Dictionary* 116 (1997)).

This Court's reading of this provision shows that the drafters listed conditions which

constitute "Company Material Adverse Effect," preceding the semicolon.  A "Company Material

Adverse Effect" means:  state of facts, an event, a change or an effect that has had, or reasonably

likely to have, a material adverse effect on the business, results of operation, prospects or financial

condition of the Company.  This first phrase is not ambiguous, but for the term "material," which,

as this Court noted above, is a question for the trier of fact.  Therefore, the issue of whether VSI's

alleged breach of the three Debt-Related Covenants constitutes an "event" or "change" which has

a "material adverse effect" on VSI's business, operation, prospects or financial condition is a

question for the trier of fact.

After the semicolon, the drafters underlined the term "provided" which means that the

drafters intended the subsequent phrase to be emphasized and to be distinct from the previous clause.

The phrase after the semicolon expresses the parties' intent that certain conditions shall be

"disregarded" and do not constitute a "Company Material Adverse Effect."  The parties then lists

four separate conditions which cannot constitute a Company Material Adverse Effect.  Reading the

two phrases separated by the semicolon together, the Court interprets the language after the

semicolon to mean that the "state of facts, events, changes and the effects" portion found in the first

phrase before the semicolon, do not include four conditions: 1) "general business or economic

conditions;" 2) "conditions generally affecting the industry in which the Company and the Company

Subsidiaries compete;" 3) "the taking of any action contemplated by this Agreement;" and, 4) "the

announcement or pendency of the transactions contemplated in this Agreement." Conditions one and two are at issue in this case. The events, such as "general business or economic conditions" and "conditions generally affecting the industry" in which the Company competes modify the "events and changes" terms of the previous clause. The events and changes found in the second clause (general business or economic conditions and conditions generally affecting the industry), even though these events and changes may in fact have a "material adverse effect on the business, results of operation, prospects or financial condition of the Company," cannot constitute a "Company Material Adverse Effect." Any other events, other than those listed after the semicolon, which have a "material adverse effect" on the Company's general business or economic condition constitute a "Company Material Adverse Effect."

Whether there existed a "general business or economic condition" and "conditions generally affecting the industry in which the Company competes," as argued by VSI, the Court finds are genuine issues of material fact raised by the parties. Both parties submitted documents supporting their position that there were no general business or economic condition or conditions affecting the industry. If the trier of fact is to find that such conditions existed, then these conditions cannot constitute a "Company Material Adverse Effect." If the trier of fact does not find that such conditions existed, then the trier of fact must determine whether VSI materially breached the three Debt-Related Covenant, and, whether the breach of the three Debt-Related Covenant constitutes a "Company Material Adverse Effect," depending on how the trier of fact interprets the language under the Termination clause, § 7.1(c).

Based on the above analysis, Defendant SPX's Motion for Summary Judgment on VSI's liability for breach of contract is denied.

11

**C.      VSI's Motion for Summary Judgment that SPX is Liable**

VSI claims it is entitled to summary judgment on the issue that SPX breached Section 5.5 of the Agreement in that SPX issued a press release on May 8, 2001 without VSI's written consent. VSI claims there may be factual disputes about other breaches by SPX, about the damages proximately caused by SPX's press release and VSI's mitigation efforts, however, VSI claims there is no genuine issue of material fact that SPX breached § 5.5 by issuing the press release without VSI's consent.  In response, SPX claims that VSI's argument is contradicted by the express terms of the Merger Agreement that allows SPX to issue a press release about the planned merger, with or without VSI's consent.

Section 5.5 of the Agreement states,

> 5.5      Public Announcements.   So long as this Agreement is in effect, the Purchaser shall not, and shall cause its affiliates not to, (a) issue or cause the publication of any press release or any other announcement or communication with respect to the Merger or the other transactions contemplated hereby without the written consent of the Company, or (b) discuss with the press or the media this Agreement, the Merger or the transactions contemplated hereby (and will refer any and all questions and inquiries to Purchaser), except in any case under (a) or (b) where such release or announcement is required by applicable Law or pursuant to any applicable listing agreement with, or rules or regulations of, NYSE, in which case the Purchaser, prior to making such announcement, will consult with the Company regarding the same.

(Agreement, § 5.5)

The provision clearly provides that SPX could not issue a press release "without the written consent" of VSI with respect to the Merger.  VSI claims SPX's President Thomas Riordan testified at his deposition that SPX had not provided "written consent" to the May 8, 2001 press release. (Riordan Dep., pp. 201-02) Specifically, Mr. Riordan testified, "[f]rom a technical standpoint, one

12

could come to that conclusion," that SPX violated the Merger Agreement by not obtaining a "written consent" from SPX. (Riordan Dep., pp. 201-02)

However, as argued by SPX, both SPX and VSI jointly issued the May 8, 2001 press release. The copy of the May 8, 2001 press release submitted by VSI states, "SPX Corporation (NYSE" SPW) *and* VSI Holdings, Inc. (AMEX: VSI) today announced that SPX Corporation has given VSI Holdings notice of circumstances that SPX Corporation claims would entitle it to terminate the merger agreement between the companies if such circumstances are not reasonably cured or possible to cure." (Ex C, VSI's Br.). Both companies' contact information is set forth in the press release. (*Id.*) The copies submitted to the Court by VSI are not on any company letterhead. The copies submitted by SPX, however, are on company letterheads. Specifically, SPX submitted a copy of the May 8, 2001 press release on SPX's letterhead. (Ex. 19, SPX's Br.) SPX also submitted a copy of the May 8, 2001 press release on VSI's letterhead. (Ex. 20, SPX's Br.) The language in both press release is identical, except that the language on VSI's letterhead contains a paragraph before the last paragraph, which does not appear on SPX's press release on SPX's letterhead, beginning with, "[c]ertain statements in this news release are forward looking statements ..." It appears from the language of the press release and from the submission of the two press releases by SPX in its brief that SPX and VSI agreed to issue a "joint" press release on May 8, 2001. There is nothing in the Agreement that requires written consent to a "joint" press release.

Additionally, § 5.5 provides an exception to the written consent requirement, "where such release or announcement is required by applicable Law or ... rules or regulations of, NYSE, ... in which case [SPX], prior to making such announcement, will consult with ... [VSI] regarding the same." The copy submitted by VSI of the press release notes at the top of the page, "FILED BY:

13

SPX CORPORATION PURSUANT TO RULE 425 OF THE SECURITIES ACT OF 1933." (Ex. C, VSI's Br.)  It appears that, even if SPX did not obtain a written consent to issue the press release, if such consent was required, SPX apparently filed the press release pursuant to Rule 425 of the Securities Act, as noted on the copy of the press release submitted by VSI.

Based on the above, VSI has not shown that it is entitled to summary judgment on its claim that SPX breached the Public Announcements provision of the Agreement.  VSI's Motion for Summary Judgment that SPX is liable for breach of § 5.5 of the Agreement is denied.

### D.   VSI's Motion for Summary Judgment on Counts II and III of SPX's Counterclaim

VSI seeks dismissal of Counts II and III of SPX's Counterclaim.  Count II alleges Fraud against VSI.  SPX claims VSI fraudulently misrepresented or omitted material information concerning the company's true financial condition, the status of its materially-important AutoShow In Motion contract with General Motors, the loss of other key business, and the full nature and adverse financial consequences of the Ford ESP program.  (SPX Counterclaim, ¶ 26) SPX claims it relied on these fraudulent misrepresentations and omissions and SPX suffered injury which injury inured to the benefit of VSI.  (SPX Counterclaim, ¶ 33) Count III alleges Civil Conspiracy against VSI, Toth, Marquis, Davis, and Schultz.  SPX alleges that the co-conspirators conspired to defraud SPX into executing the Merger Agreement by materially misrepresenting information to SPX and withholding other material information from SPX regarding VSI's true financial condition and the status, existence and adverse financial consequences of numerous, materially-important VSI customer contacts.  (SPX Counterclaim, ¶ 35)

VSI claims that because the Agreement included an integration or merger clause, SPX cannot allege that it relied on representations made before the parties' execution of the Agreement, based

14

on the parol evidence rule.  SPX argues that the parol evidence rule excepts fraudulent statements.

In Michigan, the elements of fraudulent misrepresentation are:

> 1) That defendant made a material representation; 2) that it was false; 3) that when he made it he knew that it was false, or made it recklessly, without any knowledge of its truth, and as a positive assertion; 4) that he made it with the intention that it should be acted upon by plaintiff; 5) that plaintiff acted in reliance upon it; and 6) that he thereby suffered injury.  Each of these facts must be proved with a reasonable degree of certainty.

*Hi-Way Motor Co. v. Int'l Harvester Co.,* 398 Mich. 330 (1976).  The parol evidence rule provides that, "[p]arol evidence of contract negotiations, or of prior or contemporaneous agreements that contradict or vary the written contract, is not admissible to vary the terms of a contract which is clear and unambiguous."  *Schmude Oil Co. v. Omar Operating Co.,* 184 Mich. App. 574, 580 (1990). There are exceptions to the parol evidence rule, such as evidence of prior statements on the threshold question whether a written contract is an integrated instrument that is a complete expression of the parties' agreement.  *UAW-GM Human Resource Ctr. v. KSL Recreation Corp.,* 228 Mich. App. 486, 492 (1998).  Parol evidence is also admissible to show that the contract is void because of fraud. *Id.* at 493.  When a contract contains a valid merger clause, "the only fraud that could vitiate the contract is fraud that would invalidate the merger clause itself, i.e., fraud relating to the merger clause, or fraud that invalidates the entire contract including the merger clause."  *Id.* at 504.  Fraud, silent fraud, and innocent misrepresentation all require reliance on a misrepresentation.  *Id.*

The Agreement between the parties contains a merger clause, which states,

> 8.11    Entire Agreement.  This Agreement and the documents or instruments referred to herein including, but not limited to, the Exhibit(s) attached hereto and the Disclosure Schedules referred to herein, which Exhibit(s) and Disclosure Schedules are incorporated herein by reference, embody the entire agreement and understanding of the parties hereto in respect of the subject matter contained herein.

15

> There are no restrictions, promises, representations, warranties, covenants, or undertakings, other than those expressly set forth or referred to herein.  This Agreement supersedes all prior agreements and the understandings between the parties with respect to such subject matter.

(Agreement, § 8.11)  This provision is a valid merger or integration clause.  SPX has not shown that any fraudulent statements specifically addressing the merger clause were made by VSI to SPX.

SPX claims in its Counterclaim that it relied on VSI's fraudulent misrepresentation or omission concerning the company's true financial condition, the status of its materially-important AutoShow In Motion contract with General Motors, the loss of other key business, and the full nature and adverse financial consequences of the Ford ESP program.  The merger clause states, "[t]here are no restrictions, promises, representations, warranties, covenants, or undertakings, other than those expressly set forth or referred to herein."  As to the status of the AutoShow In Motion contract with General Motors, the loss of other key business, and the full nature and financial consequences of the Ford ESP program, nothing in the Agreement sets forth these programs or business ventures.  The merger clause specifically states that there are no "representations," other than those expressly set forth in the Agreement.  (Agreement, § 8.11) Parole evidence regarding any of these three programs or business ventures cannot be admitted to show fraud, in light of the specific merger clause that the only representations SPX relied upon are those set forth in the Agreement.

However, as to VSI's "true financial condition," the Agreement sets forth VSI's financial condition.  Sections 2.8 and 2.9 of the Agreement sets forth VSI's representations as to its financial condition, as of September 30, through the date of the Agreement.  (Agreement, § 2.9) Specifically, VSI represents that, "[e]xcept as set forth in Section 2.9 of the Company Disclosure Schedule, since

September 30, 2000, through the date of this Agreement, there has not been any action taken by the Company ... that, if taken during the period from the date of this Agreement through the Effective Time, would constitute a breach of Section 4.1." (Agreement, § 2.9) This provision represents that any action taken by VSI during the period from the date of the Agreement, March 24, 2001, through the Effective Date, would constitute a breach of Section 4.1. In § 2.9, VSI does not make any representations regarding its financial condition after September 30, 2000, other than the indication that if VSI had taken any action during the period September 30, 2000 through March 24, 2001, and if it were to take such action during the period *from the date of the Agreement, through the Effective Date*, these actions would constitute a breach. The representations SPX claims VSI made were made before March 24, 2001. The Debt and Revolving Debt Statement in the Agreement, which is Attachment 2 to Section 4.1 of VSI's Disclosures, has an "as of" date of September 30, 2000. There appear to be no financial statements referring to VSI's financial condition between September 30, 2000 and the date of the signing of the Agreement, March 24, 2001. Had VSI represented in the Agreement its financial condition between September 30, 2000 through March 24, 2001, any evidence to show that such statement was a misrepresentation, may not have been barred by parol evidence. However, SPX cannot show any representation in the Agreement which it claims was misrepresented by VSI. SPX is bound by the merger clause that, "[t]here are no ... representations ..., other than those expressly set forth or referred to herein." (Agreement, § 8.11) If SPX had any understanding based on VSI's statements or representations prior to March 24, 2001, which are not included in the Agreement, such statements are barred by the parol evidence rule because the merger agreement expressly states that, the "Agreement supersedes all prior agreements and the understandings between the parties with respect to such subject matter." (Agreement, § 8.11)

17

SPX's allegations of fraud in its counterclaim are not the type of fraud claims that could invalidate a contract with a valid merger clause. *UAW-GM Human Resource Ctr.,* 228 Mich. App. at 504-05. The fraud claim, Count II, in SPX's counterclaim must be dismissed.

As to Count III, the conspiracy claim, because the conspiracy alleged is that VSI and certain individuals conspired to commit fraud against SPX, because SPX's claim of fraud is barred by the parol evidence rule and the merger clause, the conspiracy claim must also be dismissed. VSI's Motion for Summary Judgment on the fraud and conspiracy claims are dismissed.

### E.    SPX's Alternative Motion for Partial Summary Judgment re Damages

SPX claims that § 7.2 of the Agreement limits VSI's damages. VSI argues that its damages are not limited because SPX wilfully breached the Agreement. Section 7.2 of the Agreement sets forth damages SPX is liable for if it were found to have breached the Agreement:

> 7.2    Effect of Termination and Abandonment. ... (b) in no event shall the Purchaser be liable or responsible for any breach of any representation, warranty or covenant unless the Company terminates the Agreement on the basis of such breach and (i) in the case of breaches of any representation, warranty or covenant the Purchaser's liability shall be limited to the lesser of the actual damages incurred by the Company as direct result of such breaches and $9,000,000; provided, however, that the foregoing limitation shall in no event apply in connection with any wilful breach of a material covenant in this Agreement result in the failure of the closing of the Merger.

(Agreement, § 7.2)

VSI has submitted sufficient evidence to raise a genuine issue of material fact that SPX wilfully breached the Agreement. VSI claims SPX's May 8, 2001 letter to VSI alleging breaches by VSI was a pretext to SPX's true reason for terminating the Agreement. VSI submitted evidence showing that SPX withheld information to its Board regarding VSI's probable revenue of $140 million. SPX informed its Board that VSI's revenue would be the most optimistic number of $212

18

2:03-cv-70225-DPH   Doc # 224   Filed 09/30/05   Pg 19 of 22   Pg ID 5590

million. (App. 2-4; 9) Patrick O'Leary, SPX's Chief Financial Officer, represented to SPX's Board that VSI's revenue would be at $212 million, even though SPX's own independent analysis concluded that the revenues would probably be at $140 million. (App. 10; O'Leary's Dep., pp. 29-30) VSI claims that despite SPX's assertion that SPX "thoroughly investigated" the adverse changes in VSI's business (as SPX noted in its May 8, 2001 letter to VSI), SPX's principal financial analyst in the alleged investigation testified he never attempted to determine the cause of VSI's alleged financial circumstances at that time. (App. 11; Salliotte Dep., p. 94) VSI claims that when SPX scheduled the May 8, 2001 meeting, where SPX gave its notice to VSI, VSI was unaware at the outset of the meeting that the merger might be at risk or terminated. (App. 21; Appelman Dep., p. 96) VSI argues that it was ambushed by SPX on May 8, 2001, which shows that SPX's termination of the Agreement was wilful. VSI further claims that SPX refused an offer to cure the claimed breaches. SPX thought that Mr. Toth would execute a check, personally, for an estimated $7-$8 million to complete the shortfall that was anticipated, but SPX refused to accept the offer. (Riordan Dep., pp. 185-86; 188) Although VSI claims that Mr. Toth was, instead, offering to forgive the debt owed by VSI to him, personally, there is a question of fact on this issue. VSI claims that SPX abandoned the Agreement because of the general economic conditions adversely affecting the automotive industry at that time. (App. 7, Goldberg Report, p. 8) VSI claims that when SPX realized this condition, SPX sought to terminate the Agreement.

VSI has raised sufficient issues of fact to defeat summary judgment on the issue of damages. SPX's Motion for Summary Judgment on the damages issue is denied.

## III.   SPX'S MOTION TO REDRESS VSI'S DESTRUCTION OF EVIDENCE

On April 8, 2005, the Court entered an Order Regarding SPX's Motion for In Camera

Review and Further Relief allowing a computer search on the computers of Peggy Toth and Kevin Movius and to depose these two individuals thereafter. The Court, however, has not addressed SPX's Motion to Redress VSI's Destruction of Evidence. SPX claims that months after filing this suit, VSI destroyed thousands of business records from many years of its operations by going through its headquarters and dumping offices of paper content and wiping clean hundreds of computer hard drives and nearly 30 computer servers. SPX claims it is impossible to reconstruct and determine the case of VSI's profitability collapse in the months before SPX and VSI executed the Merger Agreement. The cause of VSI's financial collapse is the central contract liability issue before the Court. For the same reasons, SPX's ability to defend VSI's $200 million plus damage suit against SPX has been hampered. VSI has suggested to the Court that SPX somehow knew of and consented to the destruction of business records. SPX's counsel's declaration indicates SPX never had such notice nor consented to VSI's evidence destruction.

In response, VSI claims this is the fourth time SPX has alleged that VSI has improperly destroyed documents in this litigation. The Court entered an Order on April 8, 2005 allowing SPX access to the individual business computers of Peggy Toth and Kevin Movius. Both parties submitted reports on the status of the computer searches. Needless to say, the reports are at odds with each other. SPX claims that Ms. Toth and Mr. Movius' computers had recent "booting up" activity on April 6, 2005 prior to SPX's expert's access to the computers. SPX claims this "booting up" is suspicious activity. VSI claims that SPX has refused to narrow its searches, and, has in fact, gone beyond the search terms approved by the Court.

SPX, in its Status Report dated May 16, 2005, indicated that SPX will report to the Court more fully on the results of the investigation and may seek leave to file additional information

20

bearing on its pending motion regarding redress of destruction of evidence. SPX requested a status conference in this matter, indicating in its request that it found certain documents were destroyed. VSI agreed to the conference but denies documents were destroyed. The Court did schedule a conference but adjourned the conference to a later date.

The Court, in an August 6, 2004 Order, noted that SPX had knowledge of VSI's liquidation process in 2002 while in bankruptcy, and that it had negotiated an affidavit regarding the documents at issue in the liquidation. See, August 6, 2004 Order. This motion appears to resurrect those same arguments which the Court previously denied. The motion seeks dismissal of VSI''s breach of contract claim and costs and fees resulting from VSI's spoilation. The Court denies this motion, without prejudice, pending any further information SPX may bring to the Court's attention.

## IV.    CONCLUSION

For the reasons set forth above,

IT IS ORDERED that SPX Corporation's Motion for Summary Judgment on the breach of contract claim (**Docket No. 60, filed June 7, 2004**) is DENIED.

IT IS FURTHER ORDERED that VSI's Motion for Summary Judgment on the breach of contract claim (**Docket No. 61, filed June 7, 2004**) is DENIED.

IT IS FURTHER ORDERED that VSI's Motion for Summary Judgment on Counts II and III of SPX's Counterclaim (**Docket No. 67, filed June 28, 2004**) is GRANTED. Counts II and III of SPX's Counterclaim are DISMISSED with prejudice.

IT IS FURTHER ORDERED that SPX's Motion for Partial Summary Judgment on the Damages issue (**Docket No. 59, filed June 7, 2004**) is DENIED.

IT IS FURTHER ORDERED that SPX's Motion to Redress VSI's Destruction of Evidence

**(Docket No. 199, filed January 13, 2005)** is DENIED, without prejudice.

IT IS FURTHER ORDERED that a Status Conference be held in this matter on **Monday, October 31, 2005, 2:15 p.m.**

 /s/ DENISE PAGE HOOD_____

DENISE PAGE HOOD

United States District Judge

DATED: September 30, 2005

I hereby certify that a copy of the foregoing document was served upon counsel of record on September 30, 2005, by electronic and/or ordinary mail.

s/William F. Lewis_____

Case Manager

22